UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Latoya Edmonds, individually and as next
friend of minor, KS,                                    Case No. 12-10023

       Plaintiffs,                                   Honorable Nancy G. Edmunds

v.

Detroit Public Schools, et al.,

       Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, MOTION FOR JUDGMENT ON THE PLEADINGS, MOTION FOR SUMMARY JUDGMENT [46]

Plaintiffs Latoya Edmonds, individually and on behalf of her son, KS, a cognitively impaired 10-year-old, have filed this 28 U.S.C. § 1983 civil rights and Title IX, 20 U.S.C. § 1681, suit against various individuals of the Detroit Public Schools Systems (DPS) and DPS itself.[1] This suit arises from the alleged sexual abuse KS suffered while in school by another minor in his class, "L." Edmonds alleges that Defendants violated her and KS's First Amendment rights by retaliating against them for her reporting the assaults. Edmonds then alleges that Defendants violated KS's Fourth Amendment right to bodily integrity. And finally, Edmonds alleges that Defendants violated Title IX by failing to prevent the peer-to-peer harassment when they were on notice of the harassment.

_____

[1]The Defendants are Wilma Taylor-Costen, the superintendent of Detroit Public Schools Systems, Rachel Anderson, the principal of Carleton Elementary School, Zakiya Jackson, KS's teacher, Stephanie Adams, Ms. Jackson's teacher's aide, Darlene Anderson, a Detroit Public School social worker, and Detroit Public Schools Systems (DPS).

Before the Court is Defendants' motion to dismiss/for judgment on the pleadings, and for summary judgment.  (Dkt. 46.)

For the reasons explained below, the Court grants Defendants' motion for summary judgment.

## I.    Facts

This case arises from two incidents involving sexual grabbing and assault upon KS by L that occurred in October and November, 2011 at Carleton Elementary School in Detroit, Michigan.

In October, 2011, KS was a cognitively impaired 10-year-old who also suffered from attention deficit and hyperactivity disorder. (Defs.' Mot. for Summ. J., Ex. B, Edmonds's Dep. at 26.)  He was enrolled in Carleton Elementary School and his teacher was Ms. Zakiya Jackson and his teacher's aide was Ms. Stephanie Adams.  (*Id.* at 74.)  Edmonds stated that  she had a good parent/teacher relationship with Ms. Jackson.  (*Id.* at 75.)

The first incident occurred in the middle of October, 2011.  (Edmonds's Dep. at 83.) Edmonds was not able to give a specific date.  (*Id.*)  Edmonds stated that, when KS arrived home from school, he told her that another cognitively impaired student in his class, "L," had "grabbed his nuts[.]" (Pl.'s Resp., Ex. 7, Edmonds Aff. ¶ 4.)  Edmonds further testified that KS told her that L was grabbing KS's butt and penis when KS was trying to use the restroom and was saying "nasty" things to KS.  (Edmonds Dep. at 94, 99.)

After hearing this information, Edmonds stated that she "immediately" called Ms. Jackson and Ms. Adams. (Edmonds Aff. ¶ 5.)    Edmonds stated that, in response to reporting the October, 2011 incident, Ms. Jackson expressed disbelief, stated that KS had never told her anything like that.  (Edmonds Dep. at 109.)  After reporting the incident to

2

Ms. Jackson, Edmonds stated that she spoke with Ms. Adams. (*Id.* at 113.) Edmonds related that Ms. Adams confirmed that she and Ms. Jackson had L take KS to the restroom, but that KS had never told them that L had touched him in the way described. (*Id.*) Edmonds stated that Ms. Adams told her that KS was going to the restroom every 15-20 minutes and that he needed assistance because KS would not come back in a timely manner if he did not have assistance. (*Id.* at 84.) Edmonds stated that this was the first time she had heard of KS having a restroom issue. (*Id.*) Edmonds stated that the only assistance KS would need going to the restroom was for someone to wait for him outside the door and then walk him back to the classroom. (*Id.* at 88.) The following exchange occurred at Edmonds's deposition:

> Q: Well, let me ask you this, you don't have any information to suggest that when [KS] went to the bathroom in October, that an adult didn't go with him?
> A: No, because I did ask him, were you guys on a classroom bathroom trip? Because I didn't know to the extent- - because at first in October, he told me that the boy just grabbed his nuts, he didn't say anything about mouth or anything. So I assumed that they were on a classroom bathroom break, the boys probably were in there wrestling like boys do and L. grabbed him and [KS] didn't like it.

(*Id.* at 88.)

Edmonds added that Ms. Adams told her that she and Ms. Jackson would no longer have L take KS to the restroom and that instead they will trust KS to come back in a timely manner. (*Id.* at 113-14.) Edmonds stated that she expressed that she would still be slightly uncomfortable with allowing KS to go to the restroom himself. (*Id.* at 114.) Edmonds suggested that either Ms. Jackson or Ms. Adams continue to take KS to the restroom. (*Id.*) Edmonds also suggested the possibility of her attending class to help out with KS. (*Id.*)

3

But that suggestion never materialized, because Edmonds did not have a car so that she could get to school. (*Id.* at 114-15.)

Edmonds testified that she did not go to school after the October incident. (Edmonds Dep. at 116-17.) Edmonds also testified that she did not go to the police after the first incident. (*Id.*)

After the October incident, Edmonds stated that KS did not exhibit any unusual health issues, wet the bed more often, or demonstrate any changes in behavior. (Edmonds Dep. at 118-19.) Edmonds testified that KS was not unduly distressed, and that he did not have any mental anguish." (*Id.*) The sole behavioral change Edmonds noted was that KS did not want to go to school after the October incident, because, she stated, KS expressed that the other kids were being mean to him. (*Id.* at 118.)

Ms. Adams confirmed that L did take KS to the restroom in October. (Defs.' Mot. for Summ. J., Ex. F., Adams Dep. at 24) Ms. Adams recalled that Edmonds told her about the touching incident. (*Id.* at 25.) Ms. Adams further recalled that she stated that she would not let L take KS to the restroom again. (*Id.*) And she stated that she told Ms. Jackson about the restroom arrangement at some time. (*Id.* at 25-27.)

After the October incident and phone call with Edmonds, Adams stated that she took KS to the restroom "[m]ost of the time," but added that, "there were some times, not often, that [she] had to send him alone because [she] was working . . . with a group of students[.]" (Adams Dep. at 29.) Adams testified that Edmonds, in October, mentioned the grabbing, but that the October conversation did not mention the oral sex, as in the November incident. (*Id.* at 33.)

Ms. Jackson stated that Ms. Adams informed her about the changes that she and Adams were to make in class regarding KS's restroom usage. (Defs.' Mot. for Summ. J., Ex. E., Jackson Dep. at 11.) Ms. Jackson recalled that Edmonds, in October, 2011, told her that L had touched KS in the restroom. (Jackson Dep. at 14.) But Jackson stated that Edmonds did not tell her the specifics of the incident–where the touching occurred, how it occurred, etc. (*Id.*)

Edmonds stated that KS did not report any incidents between October and November, 2011. (Edmonds Dep. at 117.)

On November 14, 2011, the second incident occurred. Edmonds recounted that KS arrived home as usual and then, after he changed out of his uniform, he started crying. (*Id.* at 123.) Edmonds stated that KS told her that L "licked [his] nuts" and "lick[ed] [him] off." (*Id.*) Edmonds added that KS also told her that L was grabbing KS's "butt," was "being mean to him and that [L] was telling [KS] not to tell." (*Id.*) Edmonds also stated that KS informed her that L was performing oral sex on him. (*Id.*)

Edmonds stated that she went to school the following day, November 15, 2011. (Edmunds Dep. at 126.) That day, around 11 a.m., she went straight to the principal's office, but she did not, at that time, talk with Ms. Anderson, the principal. (*Id.* at 130.) Edmonds then spoke with Ms. Jackson and Ms. Adams, and related KS's report. Ms. Adams was not at school on that Monday, November 14, 2011. (*Id.* at 135.) Jackson stated that she did not recall sending L with KS to the lavatory alone on November 14, 2011. (Jackson Dep. at 15.) She added that she knew she "didn't send [KS] out with [L.]" (*Id.*) After the initial conversation in the hallway, Ms. Jackson went back into the classroom, called the principal, Ms. Anderson, and Ms. Adam, Ms. Anderson, and

5

Edmonds had a conversation in the hallway.  (Edmonds Dep. at 144.)  Edmonds recounted

the initial conversation with Ms. Anderson:

> I told - - she said first, as she walked down here, what is going on? I told her,
> I said, Miss Anderson, [KS] told me yesterday after he got off the bus that a
> student by the name of [L] licked his nuts. And Miss Anderson put her head
> down like this and she goes, oh, my God, I can't believe this. Then she goes,
> why wasn't I informed about this?  Talking to Miss Jackson and Miss Adams.
> They told her, Miss Edmonds called in October but we told her that we
> wouldn't let L. take him to the bathroom any more.  And they said, so we're
> calling you down now because she came to make a complaint.

(*Id.* at 144.)

The next day, November 16, 2011, Edmonds testified that Child Protective Services

visited her home.  (Edmonds Dep. at 158.)  But CPS was not there to investigate the

incident, she said, but instead was there to investigate a comment that KS allegedly made

to someone—that his grandfather (who is deceased) or his mother's partner had rubbed

his back and fondled him sexually.  (*Id.* at 158-59.)  Edmonds testified that, "I came to them

for help and they retaliated against me.  They sent Child Protective Services to my house."

(*Id.* at 160.)

After the incident, Edmonds testified that KS woke up in the middle of the night every

other night, for the first week and a half.  (Edmunds Dep. at 51.)  She stated that he would

go into her bedroom and he would tell her that he was scared to go to the bathroom and

he was scared to be in there by himself because he was dreaming about L.  (*Id.* at 51-52.)

Edmonds added that KS would blurt out comments about L "licking him."  (*Id.* at 52.)

Edmonds also stated that, after the incident, KS started wetting the bed, every day–even

two to three times per night.  (*Id.*)  Also since the incident, Edmonds testified that KS says

that everything is "gay."  (*Id.* at 53.)

6

Edmonds stated that she wrote a statement to the Detroit Police Department. (*Id.* at 55.) She said that she also wrote out a statement to the DPS superintendent, Taylor-[Costen], but that, when she "saw that [DPS wasn't] going to help [her] and [it] retaliated against [her,] [she] withdrew [her] statement to [Taylor-Costen.]"[2] (*Id.* at 56.) Edmonds stated that she realized that Defendants were retaliating against her when Child Protective Services went to her home and was alleging that something happened to KS at home. (*Id.* at 60.)

Defendants detail what happened after the November 15, 2011 interaction between Edmonds and the Carleton staff. Principal Anderson testified that, an hour or two after her conversation with Edmonds, she referred the issue to the school's social worker, Ms. Darlene Anderson.[3] (Defs. Mot. for Summ. J., Ex. C., Rachel Anderson Dep. at 6-7.) Principal Anderson stated that she did so because Ms. Darlene Anderson had a better rapport with the students. (*Id.*) Principal Anderson stated that she did not give Darlene Anderson any details about the alleged incident between L and KS. (*Id.* at 8.) She did not do so, she stated, because she wanted Darlene Anderson to get a "clear picture" or what was going on. (*Id.*) At the end of the day, after Ms. Darlene Anderson talked with KS and L, Principal Anderson stated that Ms. Darlene Anderson told her that they needed to call Child Protective Services. (Rachel Anderson Dep. at 7.) Principal Anderson further testified

---

[2]Edmonds stated that she was going to contact the superintendent, Ms. Taylor-Costen, but she never sent any communication about the incident. (Edmonds Dep. at 152.) The first time she heard from Ms. Taylor-Costen, Edmonds testified, is after Edmonds went on TV about the incident, Ms. Taylor-Costen contacted her. (*Id.* at 153.)

[3]Principal Anderson also testified that Edmonds, at no time, told her about the alleged oral sex part of the incident. (Rachel Anderson Dep. at 10, 13-14.)

7

that Darlene Anderson informed her that KS had told her that his mother's fiancé had rubbed his back and asked him to open his pants and "pull his nuts out." (*Id.* at 21.)

Darlene Anderson stated that she first learned a little bit of the situation from Ms. Jackson. (Defs.' Mot. for Summ. J., Ex. D, Darlene Anderson Dep. at 9.) She then stated that she interviewed KS by himself. (*Id.*)  She related that KS first said that L did touch him in the bathroom. (*Id.*)  And then she stated that KS denied that L touched him in the bathroom. (*Id.*)  She then asked him if anyone was touching him sexually. (*Id.*)  She then stated that KS responded that his dad was touching him. (*Id.* at 10.)  She related that KS said his dad was rubbing his back and touching him in his private area. (*Id.*)  Given KS's representations, Darlene Anderson said she was required to report the incident to Child Protective Services. (*Id.* at 11.)

Edmonds alleges that Defendants are responsible for what happened to KS.  She stated that Ms. Adams gave her word that she would not allow L to take KS to the restroom again. (*Id.* at 136.)  She added that she believed that Ms. Jackson was responsible "because if [KS] was allowed to go that Monday, that means they never stopped allowing L. to take him to the bathroom.  So just because she wasn't there one day does not mean in between those days that it didn't happen." (*Id.*)

Edmonds stated that she never asked Ms. Jackson or Ms. Adams whether they allowed L to take KS to the restroom between the time of the first and second incident. (Edmonds Dep.. at 136-37.)  She stated that she did not know whether L took KS to the restroom on that day. (*Id.* at 137.)  Edmonds stated that she did not know whether Ms. Jackson and Ms. Adams kept their promise to not allow L to take KS to the restroom. (*Id.*)

8

The only way she would have known, she stated, was if she had been at school. (*Id.* at 142.)

Edmonds stated that KS told Ms. Jackson and Ms. Adams about both incidents. (*Id.* at 146.)

Q:    Well, didn't you tell me that Miss Adams had said to you that if anything had ever happened to him, that you would be the first to know and that [KS] was her baby? What about any experience you had with Miss Adams that would have led you to believe that she would not have told you?

A:    Because she's trying to save her job because she knew she was supposed to be the one to take him and not a minor child, that would lead me to believe.

(*Id.* at 147.)

> Because pretty much I believe that Miss Adams is the one that's responsible for K. when he's there, is what they were leading me to believe.  She was leading me to believe by her words that she was the one that kept K. with her, on the side of her, that she was the one that walked him when they went to lunch or whatever, she was the one that watched him off the bus, on the bus, not Miss Jackson.  So it would have been - - isn't that the teacher's aide's job if the kid has to go to the bathroom in between breaks, the teacher's aide, that's why she's aiding the teacher.  So if a student has to go to the bathroom, she's supposed to take him.  She's not supposed to send another cognitively impaired student to the bathroom.

(*Id.* at 148.)

Edmonds stated that she sent KS to school on November 16, 2011, but that after that day, she did not let him return to Carleton.  (Edmonds Dep. at 181.)  KS then started at Al Holmes Elementary.  (*Id.*)

L was suspended for two or three days, but then returned to school.  (Jackson Dep. at 16-17.)

KS was also deposed.  (Pl.'s Resp., Ex. 9, KS Dep.)  KS testified somewhat contradictorily, often giving "yes" answers and then "no" answers to the same question.  But

9

KS did give testimony to the effect that L was bothering him "in the lavatory." (*Id.* at 13.) KS also testified that L touched his private parts, said "nuts," "private parts," "butt" and other "nasty words." (*Id.* at 14-15.) KS also testified that L told him to "go to the bathroom." (*Id.* at 15.) KS also indicated that L "licked" him in his genital region. (*Id.* at 34-35.)

KS also answered "[n]ope" to the question of whether anyone touched him inappropriately in his class. (KS Dep. at 27.) And he answered "yes" when questioned whether Ms. Adams took him to the restroom. (*Id.* at 28.)

When asked whether Ms. Adams was there the day that L "licked" him, KS responded "yeah." (KS Dep. at 36.)

## II.   Summary judgment standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

### A. First Amendment claim

Plaintiffs have filed a First Amendment retaliation claim.  They allege that Edmonds's reporting of the alleged assaults constituted protected activity and that Defendants retaliated against Edmonds and KS in two ways (1) Jackson and Adams retaliated against

11

Edmonds for butting into school business by allowing L to take KS to the restroom again, and (2) Defendants reported Edmonds to Child Protective Services in retaliation for Edmonds's butting in.

A plaintiff alleging a First Amendment retaliation claim must prove that: (1) she engaged in protected conduct, (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct, and (3) the adverse action was taken at least in part because of the exercise of the protected conduct. *Holzemer*, 621 F.3d at 520. "This inquiry is intensely context-driven:" "Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting-whether activity is 'protected' or an action is 'adverse' will depend on context." *Id.* (citations omitted).

"Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact." *Holzemer*, 621 F.3d at 524 (citation omitted). "[T]he harassment necessary to rise to a level sufficient to deter an individual is not extreme." *Id.* (citation omitted). The adverse-action requirement "is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id.* (citation omitted). "[I]f a reasonable trier of fact could conclude that a retaliatory act would deter a person from exercising his rights, then the act may not be dismissed at the summary judgment stage." *Id.* (citation omitted).

A "motivating factor" is a factor "without which the action being challenged simply would not have been taken." *Holzemer*, 621 F.3d at 525 (citation omitted).

12

Courts recognize that a plaintiff rarely is able to show proof of a retaliatory intent with direct evidence. *Holzemer*, 621 F.3d at 525 (citation omitted). While direct evidence is rare, a plaintiff may survive summary judgment by putting forth circumstantial evidence of a retaliatory intent. *Id.* (citation omitted). Temporal proximity can be such a type of circumstantial evidence. *Id.* at 526. "In analyzing the facts in temporal proximity cases, [courts] have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn." *Id.* (citation omitted). While temporal proximity may suffice, the Sixth Circuit has noted that "often evidence in addition to temporal proximity is required to permit the [retaliatory] inference." *Id.* (citation omitted).

### 1.  Plaintiffs fail to establish that an adverse action was taken at least in part because of the protected conduct

Plaintiffs' First Amendment claim fails because they cannot establish that the adverse action was taken because of the protected conduct.[4]  Plaintiffs allege that summary judgment is not appropriate on the First Amendment claim. Plaintiffs allege that "[a] reasonable juror could easily believe–

(1)   Mom Latoya Edmonds complained about [KS] being sexually assaulted at school in October, 2011;

(2)   Defendants did not like her "butting in" and/or "telling them how to perform their jobs," etc;

---

[4]Defendants concede that Edmonds's reporting activity could constitute protected conduct. (Defs.' Mot. for Summ. J. at 9.) The Court solely addresses the third element of the First Amendment claim, because it is dispositive.

13

(3)   Defendants told Mom Latoya Edmonds that they would change their policy and practice of letting the predator/sexual assaulter take [KS] to the lavatory, such that from now on, the teacher or teacher's aide would take little [KS] to the lavaotry and not [L,] the perpetrator–

(a)   However, Defendants lied to the mom, secretly believing "You can't believe anything [KS] says:'

(4)   Defendants then intentionally and retaliatorily stayed with their own policy and practice, and instructed predator [L] to take little [KS] to the lavatory, whereupon the second vicious sexual assault . . . occurred;

(5)   Thereafter, to protect themselves from the lawsuit they knew was coming, Defendants falsely claim "*Now* we believe what [KS] said about being sexually assaulted–by a male at his home"–such that they sic CPS upon Mom Latoya Edmonds in retaliation.

(Pls.' Resp. at 15.)  Plaintiffs argue that "[t]he above scenario is supported by substantial evidence in this case, and certainly warranted by the evidence and the inferences therefrom."  (*Id.* at 16.)

Defendants argue that Plaintiffs are conflating the individual defendants' actions and that, taking each individual separately, Plaintiffs cannot show that Defendants took any action because of Edmonds's reporting of the assaults.  (Defs.' Mot. for Summ. J. at 10.) The Court agrees.  The Court therefore reviews the alleged retaliatory conduct with respect to the individual defendants and the two alleged retaliatory actions.

**a.  The second alleged assault**

14

Plaintiffs allege that Defendants facilitated the second assault by allowing L to take KS to the restroom in retaliation for Edmonds's reporting the first alleged assault.

As to Principal Anderson, Ms. Darlene Anderson, and Ms. Taylor-Costen, there is no evidence that they even knew about the first assault or Edmonds's reporting of the first assault to Ms. Jackson and Ms. Adams. The Court therefore finds that Plaintiffs have failed to show, as is required by a First Amendment claim, that "the adverse action was taken at least in part because of the exercise of the protected conduct." Plaintiffs' First Amendment claim fails as to these three defendants for this reason and the Court dismisses these claims with respect to them.

As to Ms. Adams, there is evidence, unchallenged by Plaintiffs, that she was not present on the day of the second alleged assault. There is also evidence, unchallenged by Plaintiffs, that Ms. Adams reported the arrangement not to allow L to take KS to the restroom to Ms. Jackson. Given Ms. Adams's absence, the Court finds that Plaintiffs cannot show, again, that "the adverse action was taken at least in part because of the exercise of the protected conduct." Summary judgment is therefore appropriate as to Ms. Adams as well.

The claim against Ms. Jackson requires a little more discussion. Ms. Jackson knew that Ms. Edmonds reported the first alleged assault, and knew of the arrangement not to allow L to take KS to the restroom, and she was at school on the day of the alleged second assault.

But those facts, standing alone, do not create an issue of fact as to whether Ms. Jackson took an adverse action because of Edmonds's reporting the first alleged assault.

15

Edmonds reported that she had a good relationship with Ms. Jackson. (Edmonds Dep. at 75.) And while Edmonds stated that Ms. Jackson expressed "disbelief" when Edmonds told her about the incident, that disbelief does not show any type of intent to retaliate against Edmonds.

The Court is persuaded that Plaintiff has failed to bring forth evidence that Ms. Jackson's actions were taken in part because of her reporting the first alleged assault. The Court notes that the second event occurred a month after the first. (Edmonds Dep. at 117.) Ms. Jackson also stated that she did not recall allowing KS to the restroom by himself and did not send L with him on November 14, 2011. (Jackson Dep. at 15.) Plaintiffs have done nothing to contradict Ms. Jackson's report. In fact, Edmonds stated that she never asked Ms. Jackson or Ms. Adams whether they allowed L to take KS to the restroom between the time of the first and second incident. (Edmonds Dep. at 136-37.) She stated that she did not know whether L took KS to the restroom on that day. (*Id.* at 137.) Edmonds also stated that she did not know whether Ms. Jackson and Ms. Adams kept their promise to not allow L take KS to the restroom. (*Id.*) The only way she would have known, she stated, was if she had been at school. (*Id.* at 142.)

Edmonds argues that Ms. Adams gave her word that she would not allow L to take KS to the restroom again. (Edmunds Dep. at 136.) She added that she believed that Ms. Jackson was responsible "because if [KS] was allowed to go that Monday, that means they never stopped allowing L. to take him to the bathroom. So just because she wasn't there one day does not mean in between those days that it didn't happen." (*Id.*)

16

Plaintiffs argue that Ms. Jackson did not like Edmonds "butting in" and/or "telling [her] how to perform [her] job[.]" But, there is no evidence that supports this argument. While circumstantial evidence and even temporal proximity can support a First Amendment retaliation claim, here, the claim fails because there is no evidence that supports Plaintiffs' argument. There is further no circumstantial evidence, including the timing of the alleged events, that would lead a jury to find that Ms. Jackson intentionally permitted or even permitted L to take KS to the restroom because of Edmonds's reporting.

The Court recognizes the severity of Plaintiffs' allegations, and notes that, on this motion for summary judgment, it must take as true that the first and second sexual assaults did happen. But even if those assaults did happen, Plaintiffs have failed to create an issue of fact that the second assault happened in retaliation for Edmonds's reporting of the assaults.

Plaintiffs' First Amendment claim against all defendants based on allowing the second alleged assault, including DPS, fails.

### b. Child Protective Services visit

Plaintiffs also allege that Defendants sent CPS to Edmonds's home in retaliation for Edmonds's reporting the alleged assaults. Defendants argue that the only person who contacted CPS was Darlene Anderson, the school's social worker.

Defendants have pointed to evidence that shows that their argument is based in fact. Principal Anderson testified that, after she learned of the alleged assault on November 15, 2011, she referred the issue to the school's social worker, Darlene Anderson. (Rachel Anderson Dep. at 6-7.)

17

When Darlene Anderson took over the situation, she stated that she first learned a little bit about the situation from Ms. Jackson. (Darlene Anderson Dep. at 9.) She then stated that she independently interviewed KS and that he told her, albeit inconsistently, that someone at his home had touched him sexually. (*Id.* at 10.) Given KS's representations, Darlene Anderson said she was required to report the incident to CPS. (*Id.* at 11.)

At the end of the day, after Ms. Darlene Anderson talked with KS and L, Principal Anderson stated that Ms. Darlene Anderson told her that they needed to call CPS. (Rachel Anderson Dep. at 7.)

The Court agrees with Defendants that there is no evidence that even suggests that Ms. Jackson, Ms. Darlene Anderson or any of the defendants sent CPS to Edmonds's house in retaliation for Edmonds's reporting of the alleged assault.

The Court further finds that Plaintiffs have brought forth no evidence that Defendants retaliated in the form of sending CPS to Edmonds's home based upon Edmonds's reporting of the alleged abuse.

Summary judgment is appropriate on the aspect of the First Amendment claim against Defendants.

### B. Plaintiffs' Fourth/Fourteenth Amendment claim

In their complaint, Plaintiffs alleged a Fourth Amendment "seizure" of KS/invasion of KS's body and genitalia/"blatant assault and battery of his body" KS claim. (Dkt. 39, Am. Compl. Count II.) Plaintiffs then allege that Superintendent Costen-Taylor and Principal Anderson are liable on the theory that they either knew of the first assault or because they

18

failed to train Ms. Jackson and Ms. Adams with regards to these types of alleged assaults. (*Id.*)

Defendants point out in their motion for summary judgment that no Fourth Amendment claim exists against them, because they did not seize KS, L did. (Def.'s Mot. for Summ. J. at 15.)

In their response, Plaintiffs, for the first time, raise a Fourteenth Amendment substantive due process "right to bodily integrity" claim. (Pls.' Resp. at 17.) Defendants respond to this claim in their reply brief. (Dkt. 52, Defs.' Reply.) The Court substantively addresses this claim to show that, even if the Court were to permit an amendment to the complaint, the claim would fail. Plaintiff also present authority from another circuit that this type of claim is a Fourth Amendment claim. Regardless of the appropriate amendment, the claim fails.

"The Fourteenth Amendment's Due Process Clause does not protect citizens against the actions of private persons, with limited exceptions. One such exception covers certain 'special relationships' created or assumed by the State with respect to particular individuals, which may give right to such an affirmative duty and are enforceable through the Due Process clause to provide adequate protection." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356 , 366 (6th Cir. 2012) (citation and quotation marks omitted). "Even absent a special relationship, the state may not, through its own affirmative acts, cause or greatly increase the risk of harm to its citizens at the hand of private actors." *Id.* (citation omitted). The Sixth Circuit has restricted the "so-called 'state-created danger' doctrine to scenarios where the state's actions 'cause a 'special danger' to the plaintiff, *i.e.*, place him specifically

at risk, as distinguished from a risk that affects the public at large.'" *Id.* (citation omitted).

There are three requirements for the state-created-danger theory of due process liability: "an affirmative act that creates or increases the risk, a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability." *McQueen v. Beecher Community Schools*, 433 F.3d 460, 464 (6th Cir. 2006)(citation omitted).

"Liaiblity under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *McQueen*, 433 F.3d at 464 (citation omitted) (and surveying Sixth circuit case law for what does and does not constitute an affirmative act.).

The Sixth Circuit has also set a high bar for the showing of a special danger. *McQueen*, 433 F.3d at 467-68 (citation omitted).  The court stated that "a special danger exists 'where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large." *Id.* at 468 (citation omitted).

The Sixth Circuit has stated that a plaintiff "must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *McQueen*, 433 F.3d at 469 (citation omitted).  "The government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense, but the standard is no calibrated yard stick." *Id.* (all quotation marks and citations omitted). "The guiding principle seems to be that a deliberate-indifference standard is appropriate in settings that provide the opportunity for reflection and unhurried judgments, but that a

higher bar may be necessary when opportunity for reasoned deliberation are not present." *Id.* (citations, quotation marks, and brackets omitted) (finding the deliberate indifference standard appropriate because the teacher had the opportunity to reflect.).

The Sixth Circuit equates "deliberate indifference with subjective recklessness . . . which means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk exists, and he must also draw the inference[.]" *McQueen*, 433 F.3d at 469 (citation omitted). "Subjective recklessness can 'be proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it." *Id.* (citation omitted).

The issues that Plaintiffs raise are whether Defendants had a special relationship/created a state danger with KS based on the first reporting of an assault and whether they undertook an affirmative duty by telling Edmonds that L would not escort KS to the restroom anymore and thereafter exposed KS to danger when they allegedly did not follow their promise with the appropriate culpability. Defendants allege that Ms. Jackson and Ms. Adams did not undertake an affirmative act that created or increased the risk to KS. (Defs.' Mot. for Summ. J. at 3.)

Plaintiffs point to *Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226 (10th Cir. 1999) in support of their claim. In *Sutton*, the minor child suffered from severe cerebral palsy, mental retardation, total blindness and was unable to speak. 173 F.3d at 1230. There, on February 16, 1995, the minor communicated to his mother that he had been sexually assaulted while using the restroom at school. *Id.* The mother immediately notified the school superintendent, the principal, and the minor's teacher. *Id.* The next morning,

the mother met with the principal and the teacher and told them what the minor had communicated to her.  *Id.*  At the meeting, the principal and the teacher "assured" the mother that her son and the assailant "were not allowed to go to the bathroom alone and that there was no way [the incident] could have happened to [the minor.]" *Id.*  The principal and the teacher "took no further action and told [the mother] there was nothing more they could do but provide constant supervision of [the minor] while in the bathroom."  *Id.*  The court stated that the mother "was reassured and promised by [the principal] and [the teacher] that [the minor] would be supervised at all times while in the bathroom."  *Id.*  A week later, on February 23, 1995, the minor was assaulted by the same boy, again in the school's bathroom.  *Id.*  The assailant was later convicted of gross lewdness and forcible assault.  (*Id.*) During the assailant's trial, a teacher's aide testified that she had escorted the minor to the restroom and stood outside the restroom waiting for him.  *Id.*  While he was in the restroom, the teacher's aide stated that she left the restroom to answer a telephone.  *Id.*  Three minutes later, when the aide returned, she noticed that the bathroom door had been shut, so she went into the bathroom and saw that the assailant was molesting the minor.  *Id.* at 1230-31.

The mother and minor sued the principal in his official capacity, under a § 1983, and alleged a violation of substantive due process under the "special relationship" doctrine and "danger creation" theory.  *Sutton*, 173 F.3d at 1237.

The Tenth Circuit explained its "danger creation" doctrine.  *Sutton*, 173 F.3d at 1237-38.  The court stated that the "danger creation" "doctrine generally provides that state officials may be liable for injuries caused by a private actor where those officials created

22

the danger that led to the harm." *Id.* at 1237.  The mother and her child alleged two variations of the doctrine.  *Id.* at 1239.  They first alleged that the principal created the danger that the minor faced "by directly participating in placing him in harm's way."  *Id.* They next alleged that the principal "failed to adopt a protective policy and inadequately informed and training school employees so as to enhance the danger of sexual assault to [the minor.]"  *Id.*  The Tenth Circuit found no merit in the first claim, but reversed the district court's 12(b)(6) dismissal on the second claim.  *Id.*

In addressing the first claim, the Tenth Circuit stated that "it is not enough to show that the state increased the danger of harm from third persons; the § 1983 plaintiff must also show that the state acted with the requisite degree of culpability in failing to protect the plaintiff."  *Sutton*, 173 F.3d at 1238 (citations and brackets omitted).  The Tenth Circuit elaborated that, "[t]hat is, plaintiff-appellant's claim must be 'predicated on reckless or intentionally injury causing state action which shocks the conscience' of federal judges." *Id.* (citations and quotation marks omitted).  And the court held that the "danger creation" doctrine "necessary involves affirmative conduct on the part of the state in placing the plaintiff in danger."  *Id.* (citation and quotation marks omitted).

The court discussed, to hold the principal liable for the minor's injuries, the plaintiff-appellant "must demonstrate intentional or reckless, affirmative conduct on the part of [the principal] which created the danger, coupled with 'a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.'" *Id.* (citations omitted).  The court held that the principal did not engage in any intentional or reckless affirmative act designed to harm the minor.  *Id.* at 1239.  The court found that the principal's

promise that the minor would not be left unattended in the bathroom showed that the principal did not intend harm upon the minor and was not reckless. *Id.* The court stated that the principal, at most, was negligent, which would not support a Due Process Clause claim. *Id.* (citations omitted).

The Tenth Circuit then addressed the claim that the principal, with deliberate indifference, failed to adequately train school employees or adopt or implement a policy to prevent sexual assaults. *Suttin*, 173 F.3d at 1239. There, the court, in addressing a motion to dismiss appeal, found that the complaint stated a plausible claim. *Id.* The claim there alleged that the principal acted "with reckless indifference and malice" towards the minor, "when he specifically failed to take action to prevent [the minor] from being repeatedly molested after being informed by [the mother] of the boy's complaints that he was being molested in the restroom while at school." *Id.* at 1240 (emphases removed). The court further noted that the allegations also included statements that the minor had been molested several times before the February 16, 1995 incident. *Id.* The court reasoned that it had to take into account all the factors the principal was presented with: the assailant's size and the fact that the assailant was not in the minor's class as well as the minor's age, cerebral palsy, mental age, blindness and inability to speak. *Id.* Given the surrounding circumstances, the Tenth Circuit found that the plaintiffs' complaint stated a plausible claim of relief, viewing all inferences in the plaintiffs' favor.

Defendants argue that *Sutton* is distinguishable from this case and that Plaintiffs ignore this circuit's law. Defendants state that *Sutton* is distinguishable in two ways. They argue that in *Sutton*, a teacher witnessed the second assault and that the school

24

defendants admitted to not adhering to an escort policy, the lack of enforcement which allowed the student perpetrator to commit the second attack. (Defs.' Reply at 3.) Defendants state that, here, there are no eyewitnesses to the attack and there is no proof that the teachers abandoned their escort policy. (*Id.*)

Defendants point the Court to *McQueen v. Beecher Community Schools*, 433 F.3d 460 (6th Cir. 2006) and argue that *McQueen* is a more appropriate analogous case, as it is a Sixth Circuit case. In *McQueen*, a mother asserted a § 1983 substantive due process claim on her deceased daughter's behalf. The mother asserted that claim because her daughter's teacher left her daughter and five other students in a classroom, unattended and during that time, another student shot the daughter. 433 F.3d at 461. The mother brought a claim against the teacher, the principal (alleging supervisory liability), and the school district (alleging municipal liability). *Id.*

The Sixth Circuit affirmed the district court's dismissal of the substantive due process claim against all the defendants. *McQueen*, 433 F.3d at 462. There, the mother alleged that the shooter had several incidents where he attacked other students, "sometimes beating them up and other times stabbing them with a pencil." *Id.* On the day of the shooting, the shooter brought a gun to school that he had obtained from home. *Id.* at 463. The teacher had left six students in the class, those who had not completed their homework. *Id.* The shooter took out the gun, threatened one student and then shot the plaintiff's daughter. *Id.*

The mother sued the teacher under state-created danger theory. *Sutton*, 433 F.3d at 463.

25

The Sixth Circuit first addressed whether the teacher or school took an affirmative act that increased the risk to the daughter. The Sixth Circuit held that the leaving of the children in the classroom, unattended, was not an affirmative act that created or increase the risk that an individual would be exposed to a private act of violence. *McQueen*, 433 F.3d at 465-66.

The Sixth Circuit stated that "[t]he danger to [the daughter] was created by [the shooter's] possession of a gun and [the shooter's] presence in the classroom with him. This danger existed irrespective of [the teacher's] location. If [the teacher] had been in the room, there is no guarantee that, upon seeing the gun, she would have gotten to [the shooter] in time to prevent the shooting[.]" *McQueen*, 433 F.3d at 466. The Sixth Circuit held that "[the daughter] would have faced the danger of [the shooter] drawing his gun and firing at her even if [the teacher] had not acted[.]" *Id.*

The court then discussed the special danger prong. The Sixth Circuit held that leaving five children unattended with an armed child was a special danger. *McQueen*, 433 F.3d at 469.

As to state culpability, the court held that the plaintiff did not produce any evidence that the teacher acted with deliberate indifference. *McQueen*, 433 F.3d at 469. The court quoted the district court and stated that, while the teacher knew that the shooter had been disruptive and sometimes violent, "no reasonable fact finder could conclude that she knew [the shooter] would use a gun to kill another student if left unsupervised for a few minutes." *Id.* The Sixth Circuit pointed out that the plaintiff did not allege that the teacher "knew or even suspected that [the shooter] had a gun, knife, or other similarly dangerous weapon

26

with him on the day of the shooting, nor did [the shooter's] history of behavioral problems suggest that he would escalate from hitting with fists, feet, and pencils to such weapons." *Id.* at 470. The Sixth Circuit stated that the plaintiff could not show that the risk of such a violent attack was so obvious that the teacher should have known about it. *Id.* (citation omitted).

The Court first finds that *Sutton* is distinguishable, both procedurally and factually. Procedurally, the Tenth Circuit was reviewing the appeal with a motion to dismiss standard and had to view the facts alleged in the complaint as true. Here, we are on a motion for summary judgment standard, which requires us to view the facts in a light most favorable to the nonmoving party, Plaintiffs, but the Court need not accept every allegation as true. Factually, in *Sutton*, the plaintiffs did not sue the teacher's aide, the person who left the minor in the bathroom unattended. The facts in *Sutton* also were stronger. The boy alleged several instances of molestation at the initial report and then, a week later, the teacher's aide caught the molestation in the act. Here, while, for purposes of summary judgment, the Court accepts as true the fact that KS was assaulted a first time and a second. The Court also accepts that Ms. Jackson and Ms. Adams were on notice of the first assault and promised to not allow L take KS to the restroom.

The Court finds that this case falls in between *Sutton* and *McQueen*. Here, while Ms. Jackson and Ms. Adams did put a no-escort-by-L policy into effect, such as the supervision policy in *Sutton*, and they were on notice that L had touched KS in his genital area before, dissimilar to the *McQueen* situation, Plaintiffs have presented no evidence that an escort occurred or that Ms. Jackson permitted or encouraged that escort. That failure to present

evidence or even make such an allegation causes Plaintiffs' Fourteenth Amendment right to bodily integrity claim to fail, for there is no evidence that Ms. Jackson acted with deliberate indifference or with the requisite culpability for a constitutional violation.

Again, Edmonds stated that she never asked Ms. Jackson or Ms. Adams whether they allowed L to take KS to the restroom between the time of the first and second incident. (Edmonds Dep.. at 136-37.)  She stated that she did not know whether L took KS to the restroom on that day.  (*Id.* at 137.)  Edmonds stated that she did not know whether Ms. Jackson and Ms. Adams kept their promise to not allow L take KS to the restroom.  (*Id.*) The only way she would have known, she stated, was if she had been at school. (*Id.* at 142.)

The Court further notes that Ms. Jackson testified that she did not send L to the restroom with KS and that she could not recall whether she sent KS to the restroom by himself on that day.

KS's testimony does nothing to create an issue of fact that Ms. Jackson acted with the requisite culpability.  While KS did convey that L assaulted and molested him in the restroom, he also stated that L told him to  "go to the bathroom."  (KS Dep. at 15.)

The situation this case presents is more than unfortunate.  If the allegations of the assault as asserted are true, nothing can make either Edmonds or KS whole.  But the fact is that not every unfortunate incident can create a successful lawsuit.  The Court finds that no reasonable juror, with the evidence presented in this case, could find that Ms. Jackson, the only person with the knowledge of the escort policy and present on the day of the

second incident, acted with the requisite intent and permitted or sent L to the restroom with KS.

Given that the Court finds that Ms. Jackson did not violate Plaintiffs' constitutional rights, the Court finds that neither Principal Anderson, nor Ms. Taylor-Costen, nor can DPS be liable for the incidents that occurred.[5]

Defendants are therefore entitled to summary judgment on this Fourth/Fourteenth Amendment claim.

## C. Plaintiffs's Title IX peer-on-peer harassment claim

Plaintiffs allege that Defendants violated Title IX, 20 U.S.C. § 1681, by not protecting KS from the second sexual assault.

Title IX provides:

---

[5]"Respondeat superior is not a proper basis for liability under § 1983. Nor can the liability of supervisors be based solely on the right to control employees, or simple awareness of employees' misconduct. Furthermore, a supervisory officials failure to supervise, control or train the offended individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the supervisor at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *McQueen*, 433 F.3d at 470 (all citations, quotation marks, and brackets omitted).

"A municipality cannot be held liable solely because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *McQueen*, 433 F.3d at 471, quoting *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978) (emphases removed). In order to "establish municipal liability pursuant § 1983, a plaintiff must allege an unconstitutional action that 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' or a 'constitutional deprivation visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Id.* (citations and brackets omitted).

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

The Sixth Circuit has held that, in certain circumstances, "peer-to-peer sexual harassment supports a Title IX civil damages claim against a funding recipient." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012) (citation omitted).   There are three prima facie elements for a Title IX claim based on student-to-student harassment:

> (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,

> (2) the funding recipient had actual knowledge of the sexual harassment, and

> (3) the funding recipient was deliberately indifferent to the harassment.

*Id.* (citations omitted).  "The deliberate indifference standard requires that the harassment 'take place in a context subject to the school district's control' in circumstances 'wherein the [school district] exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 362-63 (citations omitted, insertion in *Pahssen*.).

The Court first notes that a Title IX claim can only proceed against the funding recipient, DPS, and not the individual defendants in their individual capacities.  *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999).  The Court therefore dismisses the Title IX claim against Wilma Taylor-Costen, Rachel Anderson, Zakiya Jackson, Stephanie Adams, and Darlene Anderson.   As to the first prong, the October, 2011 incident, standing alone, does

not constitute "sexual harassment [that was] was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school." "[S]evere and pervasive" "has a distinct application in Title IX." *Hoffman v. Saginaw Pub. Schs.*, 12-10354, 2012 WL 2450805, at *6 (E.D.Mich. June 27, 2012) (Ludington, J.) (citations omitted). Courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Id.* (citation omitted). And courts must further consider the "constellation of surrounding circumstances, expectations, and relationships" involved in peer-to-peer harassment. *Id.* (citation omitted). For example, "at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Id.* at *7 (citation omitted). But that conduct, "[s]tanding alone . . . does not give rise to liability." *Id.* "Title IX . . . does not create a federal code of manners." *Id.* (citation omitted).

The conduct must be both "(1) so severe and pervasive that it effectively renders the victimized student 'excluded from participation in' or 'denied the benefits of' the education that Title IX is designed to protect; and (2) 'based on sex.'" *Hoffman*, 2012 WL 2450805, at * 7 (citations omitted).

Edmonds testified that she thought the first grabbing/assault incident was school roughhousing. And she further testified that the first incident did not have an effect upon KS's school performance, other than that he did not want to go to school because others

31

were being mean to him.  Plaintiffs have not shown that this one incident, albeit sexual in nature, constitutes severe and pervasive harassment.

But the Court notes that the first prong is satisfied with respect to the November 14, 2011 incident. For, an alleged sexual assault "obviously qualifies as being severe, pervasive, and objectively offensive sexual harassment that could deprive [a student] of access to the education opportunities provided by [his or her] school." *Soper v. Hoben*, 195 F.3d 845, 854-55 (6th Cir. 1999).

For the purposes of summary judgment, the second prong also appears to be satisfied, for Edmonds told both Ms. Jackson and Ms. Adams that L had grabbed KS's genital area in the restroom in October, 2011.

But Plaintiffs fail to satisfy the third prong, for again, as Defendants point out, Plaintiffs have failed to show that the school district or its actors were deliberately indifferent to the risk that KS would be assaulted in the restroom by L after they put the escort policy into effect.

In *Vance v. Spencer County Public School District*, 231 F.3d 253, 259-60 (6th Cir. 2000) the court found that the case hinged on the "deliberate indifference standard."  The Sixth Circuit summarized controlling case law that the deliberate indifference standard must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it.  *Id.* at 260 (quotation marks, insertions, and citations omitted).  The Sixth Circuit affirmed that "a plaintiff may demonstrate defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Id.* at 260.

32

The court further stated: "[t]he recipient is not required to 'remedy' sexual harassment nor ensure that students conform their conduct to certain rules, but rather, 'the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable.'" *Vance*, 231 F.3d at 260 (citation omitted). The deliberate indifference standard 'does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* (citation omitted). "The standard does not mean that recipients must expel every student accused of misconduct." *Id.* (citation omitted). "Victims do not have a right to particular remedial demands." *Id.* (citation omitted). "Furthermore, courts should not second guess the disciplinary decisions that school administrators make." *Id.* (citation omitted). "Although no particular response is required, and although the school district is not required to eradicate all sexual harassment, the school district must respond and must do so reasonably in light of the known circumstances. Thus, where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." *Vance*, 231 F.3d at 260-61.

Here, after the first grabbing/assault, Ms. Jackson and Ms. Adams instituted the policy to not have L escort KS to restroom anymore. Ms. Jackson and Ms. Adams stated that they would not allow L to escort KS and that they, if possible, would take KS to the

33

restroom.  But Ms. Jackson and Ms. Adams stated that, at times, they would have to send KS by himself, because they were busy.

The Court finds that the no-L-escort policy, following the first incident, was not, following from *Vance*, "clearly unreasonable."  After the first incident, Edmonds did not know the extent of the incident.  She stated:

A:      No, because I did ask him, were you guys on a classroom bathroom trip? Because I didn't know to the extent- - because at first in October, he told me that the boy just grabbed his nuts, he didn't say anything about mouth or anything. So I assumed that they were on a classroom bathroom break, the boys probably were in there wrestling like boys do and L. grabbed him and [KS] didn't like it.

(*Id.* at 88.)

Given that she did not know the extent of the assault, and the fact that Ms. Jackson and Ms. Adams addressed they situation, the Court finds that they were not deliberately indifferent.

The no escort policy worked for a month, for no incidents occurred. A month later, though, the second assault allegedly happened.  After Edmonds informed Ms. Jackson and Ms. Adams about the second assault, Ms. Jackson and Ms. Adams informed Principal Anderson and then she then involved Ms. Darlene Anderson, investigated the situation, and suspended L during the investigation.  That reaction was also appropriate and not clearly unreasonable.

34

The issue therefore is whether the school district can be held liable for the second assault happening.  The Court finds that it cannot.  Plaintiffs have failed to show how Defendants were deliberately indifferent to the risk they were on notice for.  That risk was that L was assaulting KS while L was taking KS to the restroom during class.  Plaintiffs have not put forth any evidence that L took KS to the restroom on November 14, 2011 and assaulted him.  KS also testified that L told him to go to the restroom with him.  That testimony adds to the fact that Ms. Jackson and Ms. Adams did not send L to the restroom with KS.

*Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356 (6th Cir. 2012) is instructive.  It shows how the plan that a school district puts in place need only address the incidents that it has notice of.  In *Pahssen*, the female student pointed to three incidents prior to a sexual assault to satisfy the first prong of her Title IX claim.  668 F.3d at 363.  These incidents were when the male student (1)shoved the female student into her locker, (2) told her that if she wanted to hang out with him, she would have to perform oral sex on him, and (3) made obscene gestures at the female student at a basketball game.  *Id.*  Both the district court and the Sixth Circuit found that the three incidents did not amount to severe, pervasive, and objectively offensive conduct.  *Id.*  The Sixth Circuit stated that the female student did not explain how the incidents deprived her of educational resources, opportunities, or benefits.  *Id.*  The female student argued that the court should consider "incidents involving third-party victims in its analysis of whether [the female student] experience severe, pervasive, and objectively offensive harassment."  *Id.*  She argued that these third-party incidents should have put the school district on notice that [the male

student] presented a sexual threat to *female students*, including, [the female student/plaintiff]." *Id.* (emphasis in *Pahssen*). The Sixth Circuit rejected this argument, finding that a plaintiff brining a Title IX suit as an individual must show that the individual herself was deprived of "access to educational opportunities or benefits provided by the school." *Id.* (citation omitted).

The Sixth Circuit then discussed the sexual assault itself. *Pahssen*, 668 F.3d at 364. The court held that, while the rape could have satisfied the first prong of a Title IX claim, the female student's claim still failed because she failed to show that the school district's response to the sexual assault was "deliberately indifferent." *Id.* There, the court found that the school district needed only to put a plan in effect that addressed the three incidents. *Id.* The court found that the school district's 30-day supervision plan was satisfactory. *Id.* The court further noted that while the plan was in effect, no further incidents occurred until the sexual assault. *Id.* The Sixth Circuit held that the school district "did not have 'actual knowledge that its efforts to remediate [were] ineffective," and therefore its actions cannot be held to be deliberately indifferent and caused the discrimination. *Id.* (citations omitted).

Here, as the court did in *Pahssen*, the Court finds that Defendants' no escort policy was not clearly unreasonable in light of the circumstances of the first assault. The policy addressed Edmonds's concerns at that time. And Edmonds appeared satisfied. After the second incident, Defendants performed an investigation and suspended L.

The Court finds *Sutton* distinguishable. In *Sutton*, the minor told his mother that he was molested by another student and that this molestation had occurred several times

36

before.   The mother reported that sexual abuse.   Here, Edmonds reported the grabbing/assault, but there was no expectation that L was going to sexually abuse KS in the way that he allegedly did.   The Court further notes that, in *Sutton*, the principal and teacher promised constant supervision, and then failed to follow through with that constant supervision, as the teacher's aide testified that she abandoned her post and then caught the molester attacking the minor.   Here, Ms. Jackson and Ms. Adams promised that they would not send L to escort KS to the restroom, the means by which L apparently grabbed KS.   There was no evidence that L was assaulting KS repeatedly or at any other time than a restroom break.   The escort policy therefore was adequate.

Because the Court finds that Defendants did not act with the requisite deliberate indifference, summary judgment is appropriate on this claim.

## IV.   Conclusion

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment.

s/Nancy G. Edmunds                                        
Nancy G. Edmunds
United States District Judge

Dated:  February 4, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 4, 2013, by electronic and/or ordinary mail.

s/Carol A. Hemeyer                                        
Case Manager